UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DENIS WILSON and FEABON THOMAS, each on behalf of themselves, individually, and all others similarly-situated,

Plaintiffs,

-against-

ETS SERVICES, INC., and LOUISON & PANCHAM TRANSPORTATION CORP., and ALLIED AIRPORT SHUTTLE SERVICE, INC., and COLETTE STEVENS and ALBERT HOYTE, both individuals,

Defendants.

**Civil Action No:**
**15-CV-2994 (WFK)(RLM)**


**Date of Service:**

**March 10, 2017**


# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>


Jeffrey R. Maguire, Esq.
Alexander T. Coleman, Esq.
Michael J. Borrelli, Esq.

BORRELLI & ASSOCIATES, P.L.L.C.
655 Third Avenue, Suite 1821
New York, New York 10017
(212) 679-5000
(212) 679-5005
Attorneys for Plaintiffs

**PRELIMINARY STATEMENT** ................................................................ 1

**SUMMARY OF MATERIAL FACTS** ....................................................... 3

**SUMMARY JUDGMENT STANDARD** ...................................................... 3

**ARGUMENT** ........................................................................................ 4

I.    **IT IS UNDISPUTED THAT PLAINTIFFS WERE EMPLOYEES UNDER THE FLSA AND NYLL, NOT INDEPENDENT CONTRACTORS** ................................. 4

    A.    **The FLSA's and NYLL's Broad Remedial Purposes Require the Court to Interpret Their Coverage Expansively** ................................................ 4

        1.    *FLSA* ............................................................................ 4

        2.    *NYLL* ............................................................................ 5

    B.    **The Economic Realities Conclusively Establish that Plaintiffs Were ETS Employees Under the FLSA** ..................................................... 6

        1.    *ETS Exercised Substantial Control Over Plaintiffs as Required by Its Contract with the Port Authority* ............................. 7

        2.    *Plaintiffs Had No Opportunity for Profit or Loss and Did Not Invest in ETS* ....................................................... 13

        3.    *Plaintiffs Did Not Require Skill or Initiative to Do Their Jobs* ............... 15

        4.    *Plaintiffs were Permanent Workers and Possessed Long Durations of Employment with Defendants.* ............................ 16

        5.    *Plaintiffs were Integral to Defendants' Airport Shuttle Business* ............. 17

    C.    **Defendants Exerted More than Sufficient Control to Create an Employment Relationship Under the NYLL** ...................................... 18

II.    **ETS FAILED TO PAY PLAINTIFFS MINIMUM WAGE UNDER THE FLSA AND NYLL** ............................................................................ 19

    A.    **The Record is Clear that Plaintiffs Worked Uncompensated Hours** ............ 20

    B.    **The Record is Clear that ETS Paid Plaintiffs Below Minimum Wage** .................................................................................... 22

**CONCLUSION** ................................................................................... 26

ii

## Cases

*Acosta v. Hall of Fame Music Stores, Inc.*,
   2015 WL 1003550 (E.D.N.Y. Mar. 5, 2015) .................................................. 20, 21

*Agudelo v. E & D LLC*,
   2012 WL 6183677 (S.D.N.Y. Dec. 11, 2012) ........................................................ 21

*Amaker v. Foley*,
   274 F.3d 677 (2d Cir. 2001) ............................................................................... 4

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...................................................................................... 3, 4

*Anderson v. Mt. Clemens Pottery Co.*,
   328 U.S. 680 (1946) .................................................................................... 20, 21

*Ansoumana v. Gristede's Operating Corp.*,
   255 F. Supp. 2d 184 (S.D.N.Y. 2003) ............................................................. 8, 17

*Arena v. Delux Transp. Servs., Inc.*,
   3 F. Supp. 3d 1 (E.D.N.Y. 2014) .................................................................... 12, 18

*Armata v. Unique Cleaning Servs., LLC*,
   2015 WL 12645527 (E.D.N.Y. Aug. 27, 2015)…………………………………………………….22

*Arriaga v. Florida Pac. Farms*,
   305 F.3d 1228 (11th Cir. 2002) ......................................................................... 22

*Baker v. Flint Eng'g & Constr. Co.*,
   137 F.3d 1436 (10th Cir. 1998) ........................................................................... 6

*Barfield v. N.Y. City Health & Hosps. Corp.*,
   537 F.3d 132 (2d Cir. 2008) ............................................................................... 5

*Beckman v. KeyBank, N.A.*,
   293 F.R.D. 467 (S.D.N.Y. 2013) ........................................................................... 5

*Brock v. Superior Care, Inc.*,
   840 F.2d 1054 (2d Cir. 1988) ..................................................................... 4, 6, 7

*Brooklyn Sav. Bank v. O'Neil*,
   324 U.S. 697 (1945) .......................................................................................... 4

*Browning v. Ceva Freight, LLC*,
   885 F. Supp. 2d 590 (E.D.N.Y. 2012) .............................................................. 15, 18

*Bueno v. Mattner*,
   633 F. Supp. 1446 (W.D. Mich. 1986) ................................................................. 21

*Bynog v. Cipriani Grp., Inc.*,
  1 N.Y.3d 193 (2003) ............................................................................. 18, 19

*Campos v. Zopounidis*,
  2011 WL 2971298 (D. Conn. Jul. 20, 2011) ............................................. 14, 15, 16

*Carter v. Dutchess Cmty. Coll.*,
  735 F.2d 8 (2d Cir. 1984) ....................................................................... 4

*Castellanos v. Deli Casagrande Corp.*,
  2013 WL 1207058 (E.D.N.Y. Mar. 7, 2013) .............................................. 22

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .............................................................................. 3

*Drug Mart Pharmacy Corp. v. Am. Home Products Corp.*,
  472 F. Supp. 2d 385 (E.D.N.Y. 2007) ...................................................... 3

*Ethelberth v. Choice Sec. Co.*,
  91 F. Supp. 3d 339 (E.D.N.Y. 2015) ........................................................ 13, 16, 17

*Fermin v. Las Delicias Peruanas Rest., Inc.*,
  93 F. Supp. 3d 19 (E.D.N.Y. 2015) .......................................................... 23

*Fernandez v. Kinray, Inc.*,
  2014 WL 7399303 (E.D.N.Y. Dec. 30, 2014) ............................................ 15

*Galeana v. Lemongrass on Broadway Corp.*,
  120 F. Supp. 3d 306 (S.D.N.Y. 2014) ...................................................... 5

*Gayle v. Harry's Nurses Registry, Inc.*,
  2009 WL 605790 (E.D.N.Y. Mar. 9, 2009) ............................................... 13

*Gayle v. Harry's Nurses Registry, Inc.*,
  594 F. App'x 714 (2d Cir. 2014) .............................................................. 7

*Gustafson v. Bell Atl. Corp.*,
  171 F. Supp. 2d 311 (S.D.N.Y. 2001) ...................................................... 13

*Harlen Assocs. v. Vill. of Mineola*,
  273 F.3d 494 (2d Cir. 2001) ................................................................... 3

*Hart v. Rick's Cabaret Int'l, Inc.*,
  967 F. Supp. 2d 901 (S.D.N.Y. 2013) ...................................................... *passim*

*He v. Home on 8th Corp.*,
  2014 WL 3974670 (S.D.N.Y. Aug. 13, 2014) ............................................ 23

iv

*Herman v. RSR Sec. Servs.*,
   172 F.3d 132 (2d Cir. 1999) ............................................................................ 7, 8

*Hernandez v. Punto y Coma Corp.*,
   2012 WL 3241131 (E.D.N.Y. June 13, 2012) ..................................................... 8

*Hopkins v. Cornerstone Am.*,
   545 F.3d 338 (5th Cir. 2008) .............................................................................. 6

*Irizarry v. Catsimatidis*,
   722 F.3d 99 (2d Cir. 2013) ...................................................................... 7, 8, 18

*Jacobs v. N.Y. Foundling Hosp.*,
   483 F. Supp. 2d 251, 257 (E.D.N.Y. 2007)………………………………..……………………5

*Kavazanjian v. Naples*,
   2006 WL 2795220 (E.D.N.Y. Sept. 26, 2006) ................................................. 20

*Khait v. Whirlpool Corp.*,
   2010 WL 2025106 (E.D.N.Y. Jan. 20, 2010) .................................................... 5

*Kinney v. Artist & Brand Agency LLC*,
   2015 WL 10714080 (S.D.N.Y. Nov. 25, 2015) ............................................. 8, 16

*Kuebel v. Black & Decker*,
   643 F.3d 352 (2d Cir. 2011) ............................................................................ 20

*Landaeta v. New York & Presbyterian Hosp., Inc.*,
   2014 WL 836991 (S.D.N.Y. Mar. 4, 2014) ........................................................ 5

*Lin v. Benihana Nat'l Corp.*,
   755 F. Supp. 2d 504 (S.D.N.Y. 2010) .............................................................. 23

*Marshall v. Sam Deli's Dodge Corp.*,
   451 F. Supp. 294 (N.D.N.Y. 1978) ................................................................... 23

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ........................................................................................... 3

*McGlone v. Contract Callers, Inc.*,
   49 F. Supp. 3d 364 (S.D.N.Y. Aug. 25, 2014) ......................................... 4, 20, 21

*Mednick v. Albert Enters., Inc.*,
   508 F.2d 297 (5th Cir. 1975) ............................................................................. 6

*Morangelli v. Chemed Corp.*,
   922 F. Supp. 2d 278 (E.D.N.Y. 2013) ......................................................... 22, 23

*Nationwide Mut. Ins. Co. v. Darden*,
   503 U.S. 318 (1992) ............................................................................ 5

*Peralta v. WHM Tool Group, Inc.*,
   2005 WL 2002454 (E.D.N.Y. Aug. 19, 2005) ........................................... 3

*Perez v. Westchester Foreign Autos, Inc.*,
   2013 WL 749497 (S.D.N.Y. Feb. 28, 2013) .............................................. 22

*Reich v. Circle C. Investments, Inc.*,
   998 F.2d 324 (5th Cir. 1993) ............................................................... 13

*Rutherford Food Corp. v. McComb*,
   331 U.S. 722 (1947) ............................................................................ 7

*Saleem v. Corp. Transp. Grp., Ltd.*,
   52 F. Supp. 3d 526 (S.D.N.Y. 2014) ................................................. 15, 18

*Salinas v. Starjem Rest. Corp.*,
   123 F. Supp. 3d 442 (S.D.N.Y. 2015) ............................................... 20, 21

*Scantland v. Jeffry Knight, Inc.*,
   721 F.3d 1308 (11th Cir. 2013) ......................................................... 6, 13

*Schwind v. EW & Assoc., Inc.*,
   357 F. Supp. 2d 691 (S.D.N.Y. 2005) .................................................... 16

*Thomas v. TXX Servs., Inc.*,
   2015 WL 5793699 (E.D.N.Y. Sept. 30, 2015) .......................................... 5

*Velu v. Velocity Express, Inc.*,
   666 F. Supp. 2d 300 (E.D.N.Y. 2009) ............................................... 18, 19

*Wang v. Hearst Corp.*,
   2016 WL 4468250 (S.D.N.Y. Aug. 24, 2016) ......................................... 20

*Zheng v. Liberty Apparel Co.*,
   355 F.3d 61 (2d Cir. 2003) ................................................................... 3

*Zhong v. Zijun Mo*,
   2012 WL 2923292 (E.D.N.Y. Jul. 18, 2012) ................................. 8, 14, 16

**Statutes**

29 U.S.C. § 203(g) ............................................................................ 4

29 U.S.C. § 206(a) ...................................................................... 20, 22

29 U.S.C. § 211(c) ............................................................................ 20

29 U.S.C. 203(d) ............................................................................................................... 4

NYLL § 652(1) ............................................................................................................... 20

NYLL § 198-b.............................................................................................................23

NYLL § 198-d.............................................................................................................23

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................................... 3

**Regulations**

29 C.F.R. § 516.2)........................................................................................................... 20

29 C.F.R. § 531.35 .......................................................................................................... 22

29 C.F.R. § 778.5 ............................................................................................................ 22

C.F.R. § 531.3(d) ............................................................................................................ 23

## PRELIMINARY STATEMENT

Named-Plaintiffs Denis Wilson and Feabon Thomas, and the four opt-in Plaintiffs, Michael Cooke, Germaine Allen, Christopher Ricketts, Cashmere Mudayh, (all six, together where appropriate, as "Plaintiffs"), file this brief in support of their motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56(a), seeking an order with respect to two critical issues.  First, Plaintiffs seek an order that they were "employees," and not independent contractors, under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL").  Second, Plaintiffs seek an Order finding Defendant ETS Services, Inc. ("ETS" or "Defendant") liable for failing to pay Plaintiffs at the minimum wage that either FLSA or NYLL require.[1]  Plaintiffs all allege that they worked for ETS's airport shuttle service, transporting airport travelers in shuttle vans with ETS logos pursuant to a contract that ETS had with the Port Authority of New York and New Jersey ("Port Authority").

The Court should grant Plaintiffs' motion because there is no issue of material fact that ETS was Plaintiffs' employer under the FLSA and NYLL, and therefore was required to pay Plaintiffs at least the minimum wage under both of those laws, which it did not do.

First, with respect to the issue of whether an employment relationship existed between Plaintiffs and ETS, there is no dispute of fact that ETS contracted with the Port Authority to provide a shared-ride service to airport passengers (hereinafter referred to as the "PA Contract"). The record further establishes that ETS exhibited a substantial amount of, if not complete control in ensuring that its drivers complied with the terms and conditions of the PA Contract, and the testimony of an ETS manager/president confirms this.  There is also no question, in completing

---

[1] This motion does not seek summary judgment with respect to liability against Defendants Louison & Panchem Transportation Corp., Allied Airport Shuttle Service, Inc., and their current and former owners, and Plaintiffs' former supervisors, Defendants Albert Hoyte and Colette Stevens (hereinafter, where appropriate, referred to with ETS as "Defendants").  Nor do Plaintiffs seek a ruling summarily awarding them damages with respect to their minimum wage claims.

1

the multi-factored analysis under the FLSA, that Plaintiffs: (1) had little or no opportunity for profit or loss other than to simply work more hours for ETS; (2) were required to possess little skill or independent initiative to drive for ETS; (3) worked on a full-time basis with long employment periods; and (4) were integral, if not indispensable to ETS's business.  Weighing these factors, it cannot be argued that Plaintiffs were in business for themselves.  Indeed, such a scenario would be impossible, as only ETS had a contract with the Port Authority.  Under the NYLL analysis, similarly, the record makes clear that ETS set schedules and fares, imposed uniform, and identification requirements for its drivers, and also maintained a queue system in order to ensure that ETS had trips scheduled for certain times in compliance with the PA Contract.  Thus, the Court should find that no issue of material of fact exists under either the FLSA or NYLL analyses and find that Plaintiffs were ETS's employees and not independent contractors.

Second, because summary judgment on the employee-contractor issue in Plaintiffs' favor is warranted, Plaintiffs are also entitled to summary judgment on the issue of ETS's liability under the minimum wage requirements of the FLSA and NYLL, as the record clearly demonstrates that ETS failed to pay Plaintiffs at the applicable minimum wage rate for all hours worked.  Indeed, based upon the estimates by Plaintiffs of their days and hours worked, corroborated by the documentary evidence produced, it is undisputed that Plaintiffs routinely worked at least sixty hours per week, and often worked as many as eighty-four hours per week.  Additionally, based upon the pay records produced both by ETS and Plaintiffs, there is no dispute that Plaintiffs' hourly rates of pay fall below the statutorily-applicable minimum wage rates under both the FLSA and NYLL.  Therefore, the Court should grant Plaintiffs' motion as to minimum wage liability under both laws against ETS.

2

## SUMMARY OF MATERIAL FACTS[2]

For a recitation of all facts relevant to this motion, in narrative fashion, Plaintiffs respectfully refer the Court to their statement of undisputed facts submitted herewith.

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment upon showing that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 76-77 (2d Cir. 2003). "One of the principle purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses." *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 472 F. Supp. 2d 385, 393 (E.D.N.Y. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). A dispute over a "material fact" is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Although all facts and inferences therefrom are to be construed in the light most favorable to the party opposing the motion, *see Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001), the nonmoving party must raise more than just a 'metaphysical doubt as to the material facts.'" *Peralta v. WHM Tool Group, Inc.*, 2005 WL 2002454, at *1 (E.D.N.Y. Aug. 19, 2005) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); . "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen*, 273 F.3d at 499. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

---

[2] All references to "Ex." in this Memorandum of Law refer to the exhibits found annexed to the March 10, 2017 Declaration of Jeffrey R. Maguire submitted in support of this motion.

"The opposing party may not avoid summary judgment by relying solely on conclusory allegations or denials that are unsupported by factual data." *McGlone v. Contract Callers, Inc.*, 49 F. Supp. 3d 364, 370 (S.D.N.Y. Aug. 25, 2014) (citing *Amaker v. Foley*, 274 F.3d 677, 680-81 (2d Cir. 2001)).  Thus, a party opposing a motion for summary judgment can only defeat the motion by setting forth "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citation and quotation omitted).  The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

## ARGUMENT

## I.   IT IS UNDISPUTED THAT PLAINTIFFS WERE EMPLOYEES UNDER THE FLSA AND NYLL, NOT INDEPENDENT CONTRACTORS

### A.   The FLSA's and NYLL's Broad Remedial Purposes Require the Court to Interpret Their Coverage Expansively

#### 1. *FLSA*

Courts interpret the FLSA's coverage broadly to further its remedial goals of combating unemployment and protecting workers from abusive working conditions. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1945); *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984).  To achieve these ends, Congress expansively defined the terms "employee," "employer," and "employ," so that the FLSA would apply to as many workers as possible. *Carter*, 735 F.2d at 12 (the FLSA has been written in the "broadest possible terms"); *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988) (noting that the definition of "employ" is "necessarily a broad one in accordance with the remedial purpose of the Act").

The FLSA defines an "employee" as "any person acting directly or indirectly in the interest of an employer." 29 U.S.C. 203(d), and "employ" as including "to suffer or permit to work," 29 U.S.C. § 203(g), so as to reflect the FLSA's "striking breadth," and Congress's intent

4

to "stretch[] . . . the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992)).[3]

### 2. *NYLL*

The NYLL parallels the FLSA's remedial intent with nearly identical definitions,[4] and as with the FLSA, courts routinely note the NYLL's equally established remedial nature. *Galeana v. Lemongrass on Broadway Corp.*, 120 F. Supp. 3d 306, 318 (S.D.N.Y. 2014); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013); *Khait v. Whirlpool Corp.*, 2010 WL 2025106, at *8 (E.D.N.Y. Jan. 20, 2010).   Importantly, while the determination of employee status under the FLSA is substantially similar to that under the NYLL, there is a difference in focus that warrants separate analyses. *Thomas v. TXX Servs.*, *Inc.*, 2015 WL 5793699, at *16 (E.D.N.Y. Sept. 30, 2015), *vacated and remanded on other grounds*, 663 F. App'x 86 (2d Cir. 2016) (citing *Landaeta v. New York & Presbyterian Hosp., Inc.,* 2014 WL 836991, at *4 (S.D.N.Y. Mar. 4, 2014)) (noting that the FLSA looks to the economic reality of the relationship while New York law focuses on the degree of control exercised by the employer).   Significantly, "[d]espite the different emphasis, there appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa)." *Thomas*,

---

[3] Individual FLSA coverage is not disputed in the present matter as Plaintiffs routinely crossed state lines by driving ETS passengers between New York and New Jersey. SOF ¶ 96. *See Jacobs v. N.Y. Foundling Hosp.*, 483 F. Supp. 2d 251, 257 (E.D.N.Y. 2007), *aff'd*, 577 F.3d 93 (2d Cir. 2009) (noting that the FLSA's individual coverage provision is satisfied where employees are "engaged in commerce by regularly using the mail or the telephone between states, or traveling across state lines").

[4] The NYLL defines "employee" as "any person employed for hire by an employer in any employment." NYLL § 190(2).  The definition of "employed" under the NYLL is that a person is "permitted or suffered to work." NYLL § 192(7).

2015 WL 5793699, at *16 (citing *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 924 (S.D.N.Y. 2013)).  Courts are split as to whether the two tests should be analyzed separately. *Id.* In an abundance of caution, Plaintiffs will perform them separately.

### B. The Economic Realities Conclusively Establish that Plaintiffs Were ETS Employees Under the FLSA

Under the FLSA, the "ultimate concern" is "whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Brock*, 840 F.2d at 1059.  On July 15, 2015, the United States Department of Labor ("DOL") released an Administrator's Interpretation ("AI") 2015-1, noting that "[m]isclassification of employees as independent contractors is found in increasing number of workplaces in the United States," thus deciding to give "additional guidance regarding the application of the standards for determining who is an employee under the [FLSA]."[5]  The DOL's AI 2015-1 highlights the courts' common description of independent contractors based on the economic realities application as "those workers with economic independence who are operating a business of their own," and employees, on the other hand, as "workers who are economically dependent on the employer, regardless of skill level." *See id.* (citing *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008)) ("To determine if a worker qualifies as an employee, we focus on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself."); *Brock*, 840 F.2d at 1059 (2d Cir. 1988) ("The ultimate concern is whether, as a matter of economic reality, the workers depend on someone else's business . . . or are in business for themselves."); *accord Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1312 (11th Cir. 2013) (quoting *Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 301-02 (5th Cir. 1975)) (same); *Baker v. Flint Eng'g &*

---

[5] The DOL Administrator's Interpretation 2015-1 is attached to the Maguire Declaration as Exhibit 33.

*Constr. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998) (the economic realities of the relationship govern, and the focal point is whether the individual is economically dependent on the business to which he renders service or is, as a matter of economic fact, in business for himself).

It is well-settled that the question of whether a worker is treated as an employee or an independent contractor under the FLSA is determined not by contractual formalism but by "economic realities." *Gayle v. Harry's Nurses Registry, Inc.*, 594 F. App'x 714, 717 (2d Cir. 2014) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727 (1947)). Additionally, "putting on an 'independent contractor' label does not take the worker from the protection of the Act." *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013); *see Brock*, 840 F.2d at 1059 ("[E]mployer's self-serving label of workers as independent contractors is not controlling").

Rather, the Second Circuit's "analysis of the relationship turns on the economic-reality test, which weighs, (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." *Id.* (citing *Brock*, 840 F.2d at 1058-59). "No one of these factors is dispositive; rather, the test is based on a totality of the circumstances." *Id.* (citing *Brock*, 840 F.2d at 1059). Importantly, "[t]he existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law." *Brock*, 840 F.2d at 1059.

1.   *ETS Exercised Substantial Control Over Plaintiffs as Required by Its Contract with the Port Authority*

ETS exercised substantial, if not total control over Plaintiffs by dictating the terms and conditions of their work, and enforcing ETS policies in accordance with the company's contract

with the Port Authority.  Significantly, "[a]n employer does not need to look over his workers' shoulders every day in order to exercise control." *Brock*, 840 F.2d at 1060.  "That an employer does not exercise control continuously or consistently does not diminish the significance of its existence." *Hart*, 967 F. Supp. 2d at 912 (citing *Irizarry*, 722 F.3d at 111).  Moreover, "[a] purported employer exercises a degree of control where the plaintiff works exclusively for that entity." *Kinney v. Artist & Brand Agency LLC*, 2015 WL 10714080, at *14 (S.D.N.Y. Nov. 25, 2015); *accord Zhong v. Zijun Mo*, 2012 WL 2923292, at *3 (E.D.N.Y. Jul. 18, 2012).

Crucially, the control factor has been found to sufficiently weigh in favor of an employment relationship where the evidence establishes that the defendant "supervised and controlled employee work schedules and the conditions of employment." *Hernandez v. Punto y Coma Corp.*, 2012 WL 3241131, at *3 (E.D.N.Y. June 13, 2012); *Herman v. RSR Sec. Servs.*, 172 F.3d 132, 140 (2d Cir. 1999) (finding the first *Brock* factor satisfied where putative employer hired employees and "on occasion, supervised and controlled employee work schedules and the conditions of employment"); *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 190 (S.D.N.Y. 2003) (citing *Herman*, 172 F.3d at 140).

In the present case, the record evidence undoubtedly demonstrates that ETS completely controlled the Plaintiffs' work schedules and dictated the terms of their employment due to its own contractual obligations with the Port Authority.  ETS provides transportation services out of the three major New York Airports: John F. Kennedy, LaGuardia, and Newark Airport. SOF ¶ 3. ETS is obligated to perform pursuant to its contract with the Port Authority, the PA Contract, which mandates how ETS must operate its shuttle service business at the airports. SOF ¶ 20-21, 45.[6]  The PA Contract explicitly states that ETS possessed no rights to carry or conduct business operations or services at the airports other than in accordance with the terms provided in the

---

[6] Indeed, federal laws require ETS to follow certain guidelines. SOF ¶ 50.

contract. SOF ¶ 55.  The failure to do so could result in penalties and termination of the contract.

SOF ¶ 34.  Specifically, ETS's contract with the Port Authority requires that ETS:

1. conduct the business of providing, [sic] a ground transportation service by chauffeured motor vehicle using only vehicles having a capacity of seven passengers or more, including the driver, which bear proper Port Authority issued vehicle stickers, as further provided in Special Endorsement No. 15 below, for all persons (and their baggage) desiring transportation by the Permitee to and from (1) LaGuardia Airport and Newark International Liberty Airport, and (2) John F. Kennedy International Airport, LaGuardia Airport, Newark Liberty International the counties of the Bronx, Kings, Queens and Staten Island in the State of New York, and (3) John F. Kennedy International Airport, LaGuardia Airport and Newark Liberty International Airport on one hand, and all other points in the metropolitan area which the Permitee notifies the Port Authority it desires to serve (SOF ¶ 31);

2. procure and maintain all required licenses, certificates, permits, franchises or other authorizations from all governmental authorities having or asserting jurisdiction over the use of Independent Contractor Drivers by the Permitee hereunder (SOF ¶ 48);

3. comply with any and all federal state statutes and regulations, which may be applicable to this Agreement and the agreement created hereby including, without limitation those of the U.S. Federal Trade Commission and the U.S. Securities and Exchange Commission and those of the Attorney General of the State of New York (SOF ¶ 50);

4. pick-up passengers who have requested transportation with it, either directly or through Counter Personnel within 15 minutes of its promised pick-up time (SOF ¶ 52);

5. operate the Shared Ride Service on the schedule as submitted in its business plan which in any event shall include service during all hours of flight activity sufficient to meet passenger demand shall be at a minimum of at least one arrival and one departure from each Airport hereunder every two hours (SOF ¶ 53);

6. wear or carry badges or other suitable means of identification and the employees shall wear appropriate uniforms (SOF ¶ 54);

7. have no right hereunder to carry on or conduct any business operation or service at the Airport other than as specifically set forth herein (SOF ¶ 55); and

8. shall not solicit business on the public areas of the Airports (SOF ¶ 56).

There exists no dispute of fact that ETS and its drivers must and did comply with these,

in a word, "controlling" terms in order for ETS to continue to maintain its contract with the Port

Authority.  As a result, ETS took repeated steps to ensure compliance with the Port Authority's rules through the distribution of driver contracts obligating its drivers to adhere to these terms. SOF ¶ 57, 62, 98.  Specifically, the ETS Driver Contract mandates that:

1. Drivers are responsible for the collection of proper fares and accurate completion of the paper work, and will be responsible for any shortage (SOF ¶ 58);

2. All reservations have to be picked up and dropped off on time, and therefore the company must have a weekly schedule for all drivers (SOF ¶ 59);

3. All drivers must report to the dispatch office once they are on line for their schedule to start (SOF ¶ 60);

4. All drivers must report to the dispatch office when they depart and arrive at the airport (SOF ¶ 61);

5. All drivers must wear ETS-issued shirts (SOF ¶ 84);

6. All drivers must wear the specified attire required by ETS (SOF ¶ 85);

7. Drivers are not allowed to refuse work dispatched to them by the dispatcher (SOF ¶ 103);

8. Drivers must charge passengers only at the rates prescribed by ETS, and the fare stated by the ETS dispatchers is final (SOF ¶ 108);

9. Drivers are required to get vehicles painted in ETS colors (SOF ¶ 111).

Fully appreciating the significance of these contracts and attempting to shield them from discovery, Defendant Hoyte initially testified that while ETS provided contracts to its drivers "around 2008, 2009," Defendants were not in possession of any of them. SOF ¶ 64.  That assertion proved false following the compelled production of discovery ordered by Judge Mann, only after Defendants failed to initially turn them over. *See* ECF Dkt. No. 48.  Thereafter, Defendants produced, *inter alia*, the PA Contract signed by ETS, and a written contract signed by an ETS driver, Chevannes Hunter, and countersigned by ETS manager Forbes. SOF ¶ 20, 62. Logically, the terms of the contract drawn up by ETS that it provided to its drivers mandate the

10

drivers to follow the requirements of the PA Contract. SOF ¶ 45, 57.   Significantly, Plaintiff Cooke was able to produce the same Driver Contract, further establishing that ETS provided contracts to its drivers. SOF ¶ 63.   Relieving any doubt, Hoyte referenced the terms of the contract in his letter terminating Plaintiff Cooke. SOF ¶ 30.

Moreover, the testimony from Defendant Stevens removes any argument that ETS complied with the terms in the PA contract.   Specifically, Defendant Stevens testified that: (1) the PA agreement mandated ETS to have shuttles available at certain times, SOF ¶ 35; (2) ETS needed to have drivers ready to perform trips at certain times, specifically within fifteen minutes of the scheduled pick-up time, SOF ¶ 35, 38; (3) ETS had a system of shuttles departing from 6:00 a.m. through 9:30 p.m. and would put the drivers in certain slots forming a line or queue system, SOF ¶ 36; (4) drivers were required to call and give dispatchers their availability, SOF ¶ 37; (5) drivers were required to tell the dispatcher if they were no longer available, SOF ¶ 37; (6) the Port Authority only has a relationship with ETS and not any individual driver, SOF ¶ 39; (7) ETS took steps to make sure that its drivers complied with the PA contract, SOF ¶ 44; (8) drivers generally worked on ETS's day shift or night shift, SOF ¶ 40; (9) ETS has a weekly schedule for its drivers, SOF ¶ 35; (10) drivers are required to wear ETS uniforms so that the Port Authority can identify them for security purposes, SOF ¶ 41; (11) drivers cannot pick up passengers at the airports without proper ETS identification badges, SOF ¶ 42; and (12) drivers are only allowed to drive vehicles with the ETS logo, SOF ¶ 43.

Significantly, ETS also provided its drivers with memoranda, which further imposed rules and policies on the drivers. Specifically, on April 10, 2014, ETS issued a memorandum ("2014 Memo") that mandated:

> All drivers are required to give us a 12 hour window and at least 5 working days for when they will work and the days they will be taking off.  Even if you have a

11

schedule [sic] time on the line run your presents [sic] is needed to do other jobs when those jobs become available.

SOF ¶ 101.   Additionally, the 2014 Memo discussed $50.00 fines for drivers not having their ETS-issued tablets turned on to receive jobs from the dispatchers. SOF ¶ 98.   The 2014 Memo also provided that "[i]f a diver should refuse to do a job he will be charge [sic] the price of that job." SOF ¶ 102.   The 2014 Memo further imposed new weekly tablet costs on the drivers. SOF ¶ 104.

Based on the foregoing indisputable evidence, the record is clear that Defendants exerted substantial control over the Plaintiff-drivers in order to ensure performance according to its PA Contract with the Port Authority.   A plain reading of the terms in the PA Contract, the ETS-issued driver contracts, the 2014 Memo, and the testimony of ETS manager Stevens, exemplifies a high degree of control indicative of an employee-employer relationship.   Indeed, these policies, which dictated nearly every aspect of the drivers' work, demonstrate significant control designed to "help[] [ETS] achieve its business ends." *Hart*, 967 F. Supp. 2d at 916 (finding control factor satisfied where company imposed guidelines that restricted workers' behavior, regulated the method and manner of their work, addressed when they were scheduled to work, set procedures, and were principally aimed at "help[ing] [the company] achieve its business ends"); *but see Arena v. Delux Transp. Servs., Inc.*, 3 F. Supp. 3d 1, 11 (E.D.N.Y. 2014) (finding the degree of control to be insubstantial where "there is no evidence that [plaintiff-driver] was managed or supervised on a regular or ongoing basis, or that [plaintiff-driver] or any other driver was penalized for not adhering to any of these guidelines").

The first factor substantially weighs in Plaintiffs' favor.

12

2. *Plaintiffs Had No Opportunity for Profit or Loss and Did Not Invest in ETS*

Plaintiffs had no opportunity for profit or loss, and clearly had no opportunity to invest in their own business; rather, their income was completely dependent upon ETS's contract with the Port Authority.  The DOL recently stressed that a worker's ability to work more hours and the amount of work available from the employer have nothing to do with the worker's managerial skill and do little to separate employees from independent contractors – both of whom are likely to earn more if they work more and if there is more work available.[7] DOL AI 2015-1, § 2(B) (citing *Scantland*, 721 F.3d at 1316-17) ("Plaintiffs' opportunity for profit was largely limited to their ability to complete more jobs than assigned, which is analogous to an employee's ability to take on overtime work or an efficient piece-rate worker's ability to produce more pieces"); *Gayle v. Harry's Nurses Registry, Inc.*, 2009 WL 605790, at *3 (E.D.N.Y. Mar. 9, 2009), *aff'd*, 594 F. App'x 714 (2d Cir. 2014) ("[t]hat plaintiff would 'profit' more if she had worked more hours does not mean that she had an opportunity for profit").

Critically, courts have routinely held this second factor to weigh in favor of an employment relationship where workers did not have any, or had very little, investment in the employer's business. *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 351 (E.D.N.Y. 2015); *Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 325 (S.D.N.Y. 2001); *Gayle*, 2009 WL 605790, at *7 (finding that "negligible" investments do not weigh in favor of independent contractor relationship); *Hart*, 967 F. Supp. 2d at 920 (citing *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 328 (5th Cir. 1993)) (finding second factor weighed in favor of employment relationship that was "far more closely akin to wage earners toiling for a living, than to

---

[7] This factor should not focus, however, just on whether there is opportunity for profit or loss, but rather on whether the worker has the ability to make decisions and use his or her managerial skill and initiative to affect opportunity for profit or loss. DOL AI 2015-1, § 2(B) n.7.

independent entrepreneurs seeking a return on their risky capital investments").  Further, where "the [c]ompany's demands on plaintiff's time essentially precluded him from seeking outside revenue," this second factor is found to weigh in favor of an employment relationship. *Zhong*, 2012 WL 2923292, at *3 (evidence showed plaintiff "worked for employer full time"); *Campos v. Zopounidis*, 2011 WL 2971298, at *6 (D. Conn. Jul. 20, 2011) (finding plaintiff's "nominal investment in the business and inability to earn a profit militated in favor of holding that plaintiff was an employee rather than an independent contractor" where defendant "merely supplied a vehicle, which [plaintiff] also used for personal purposes, and paid all related expenses").

Here, the second factor overwhelmingly weighs in favor of an employment relationship. The PA Contract specifically forbade any drivers from conducting any business at the airports, except those arranged through ETS. SOF ¶ 55.  The PA Contract also prohibited drivers from soliciting any business on the public areas of the airports. SOF ¶ 56.  ETS set fares without driver input, on a per-trip basis. SOF ¶ 58, 106, 108.  ETS controlled and dictated the fare prices to drivers, subject to change at any time by ETS, and any questions regarding the fare would be determined by the dispatch. SOF ¶ 108.  ETS also ran promotions, fixing the fares for trips and communicating these fares to the drivers. SOF ¶ 107.  Further, because the Port Authority and ETS required that all of ETS's drivers have the ETS logo on the side of the vans, and the Plaintiffs had the ETS logos painted on their vans as required by ETS, it cannot be argued that Plaintiffs could perform work independent of ETS during their shifts or outside of their shifts without purchasing a different vehicle. SOF ¶ 43, 109, 111.  The record is also clear that Plaintiffs did not have an opportunity to invest in Defendants' business. SOF ¶ 109.

Importantly, the record plainly establishes that Plaintiffs worked full time for ETS – often for many years, and exclusively provided trips for ETS. SOF ¶ 118-127.  Moreover, there

is absolutely no evidence that Plaintiffs performed work independent of ETS, because they could not possibly do so considering the amount of hours they worked driving for ETS. SOF ¶ 118-127.

Irrefutably, Plaintiffs only chance to earn more profit was to work more hours, and there were no other means for Plaintiffs to seek profit on their own because they performed work according to the contract between ETS and the Port Authority, on fares set by ETS. Accordingly, this factor weighs strongly in favor of an employment relationship.

### 3.    *Plaintiffs Did Not Require Skill or Initiative to Do Their Jobs*

Plaintiffs' jobs as shuttle van drivers did not require skill or independent initiative. Courts have routinely found that possessing nothing more than "routine life skills," such as driving, weighs in favor of employment relationships. *Fernandez v. Kinray, Inc.*, 2014 WL 7399303, at *4 (E.D.N.Y. Dec. 30, 2014) (finding that the plaintiff-drivers were "unskilled workers and did not exercise independent initiative . . . but instead relied on defendants' assignments and communications with customers"); *Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 541 (S.D.N.Y. 2014), *order clarified*, 2014 WL 7106442 (S.D.N.Y. Dec. 9, 2014) ("[p]laintiffs are surely correct that driving is not a 'specialized skill'"); *Campos*, 2011 WL 2971298, at *7 ("the possession of a driver's license and the ability to drive an automobile is properly characterized as a routine life skill that other courts have found to be indicative of employment status"); *but see Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 609 (E.D.N.Y. 2012) (noting that courts have found that driving is "routine life skill" but distinguishing driving from "freight-handling" where the "company's goal of transporting its freight in a safe and efficient manner is significantly served by hiring experienced truck operators").

15

Here, ETS required nothing more than Plaintiffs possessing a commercial driver's license to drive for ETS. SOF ¶ 117.  Plaintiffs were not required to demonstrate any requisite skill or knowledge before driving for ETS. SOF ¶ 114.  Rather, Plaintiffs waited in a queue, were assigned a job by a dispatcher, and then drove the shuttle vans from one point to another. SOF ¶ 36-37, 59-61.  This factor unquestionably weighs in favor of an employee-employer relationship.

4.     *Plaintiffs were Permanent Workers and Possessed Long Durations of Employment with Defendants.*

Courts have routinely found a lengthy period of employment to be indicative of an employee-employer relationship. *Kinney*, 2015 WL 10714080, at *16; *Ethelberth*, 91 F. Supp. 2d at 351-52 (finding in favor of employment relationship where plaintiff worked on a full-time basis and the employment was "clearly not transient in nature"); *Zhong*, 2012 WL 2923292, at *3 ("full-time work relationship is less likely to be transient or limited in scope"); *Campos,* 2011 WL 2971298, at *8 ("[W]here there is no agreement dictating a particular term of work and the worker puts in significant hours over a substantial period of time, courts have found this factor to weigh in favor of employment status"); *Schwind v. EW & Assoc., Inc.*, 357 F. Supp. 2d 691, 702 (S.D.N.Y. 2005) (determining the permanence or duration of the relationship weighed in favor of employment status where the plaintiff "worked exclusively for defendants for approximately four years").

Here, save for a three month period in 2012 following his involvement in an auto accident when he did not work at all, Plaintiff Wilson worked exclusively for ETS from February 2007 until 2015. SOF ¶ 118.  He worked on a full-time basis, between approximately ten-to-twelve hours per day, six days per week. SOF ¶ 73, 77, 119.  Plaintiff Thomas worked for ETS on a full-time basis, typically working six or seven days per week, from 2012 until April 2015. SOF ¶ 123-124.  Plaintiff Allen worked as a driver for ETS continuously from September 2010

until August 2013, working six days per week and approximately eight hours per day. SOF ¶ 125-126.  Plaintiff Mudayh worked for ETS for eleven hours per day, seven days a week, for a period of ten months. SOF ¶ 127. Plaintiff Cooke drove for ETS from January 2007 until December 2013, working seven days per week, approximately fourteen hours per day. SOF ¶ 127.

Irrefutably, Plaintiffs put in significant hours and performed work exclusively for ETS during their entire shifts for months and years on end.  There is no plausible argument that Plaintiffs were "transient in nature," and resultantly, this factor substantially weighs in favor of an employment relationship.

5.      *Plaintiffs were Integral to Defendants' Airport Shuttle Business*

Courts find an employee relationship when the workers are engaged in the employer's "primary business." *Ethelberth*, 91 F. Supp. 2d at 352 (finding the fifth factor to weigh in security guards' favor where the guards performed work integral to company's "primary business of providing security services"); *Ansoumana*, 255 F. Supp. 2d at 191 (finding that fifth factor "weighs heavily in favor of an employment relationship" where the workers were delivery persons for a delivery service company).

Here, this factor again weighs heavily in favor of the Plaintiffs, who performed the transportation services for ETS's transportation business.  ETS provides "expert transportation" services to its clientele by shuttle runs pursuant to its contract with the Port Authority. SOF ¶ 3, 20.  Inarguably, ETS's revenue is based solely upon the driving of its drivers. SOF ¶ 3.  This factor is thus not in dispute. *See Saleem*, 52 F. Supp. 3d at 543 ("Indisputably, Defendants' business could not function without drivers, and Defendants wisely do not argue to the contrary").

17

In sum, based upon a totality of circumstances, there is no issue of fact that Plaintiffs were completely reliant upon ETS's business for their livelihoods, were inarguably not in business for themselves, and ETS could not operate without the work that Plaintiffs performed. Therefore, this Court should find as a matter of law that Plaintiffs were ETS's employees within the meaning of the FLSA.

### C.   Defendants Exerted More than Sufficient Control to Create an Employment Relationship Under the NYLL

As explained above, "[m]any courts in this Circuit have applied the economic realities test to determine whether an employer/employee relationship exists under the FLSA *and* the NYLL." *Hart*, 967 F. Supp. 2d at 922 (internal quotation omitted) (emphasis in original).  The Second Circuit has explained, however, that the analyses may differ. *Irizarry*, 722 F.3d at 117 ("Plaintiffs may assert that the tests for 'employer' status are the same under the FLSA and the NYLL, but this question has not been answered by the New York Court of Appeals").  Under the NYLL, the "critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Arena*, 3 F. Supp. 3d at 13 (citing *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003)).  Although "substantially similar" to the FLSA, *see Browning*, 885 F. Supp. 2d at 599, the "degree of control exercised by the purported employer" is the critical inquiry rather than the "economic reality of the situation." *Velu v. Velocity Express, Inc.*, 666 F. Supp. 2d 300, 307 (E.D.N.Y. 2009).

When courts perform a separate NYLL analysis, the relevant factors include: "whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Id.* (citing *Bynog*, 1 N.Y.3d at 198).

18

As discussed previously, and for the same reasons discussed in detail above, here, ETS exerted substantial control over the terms and conditions of Plaintiffs' work driving for ETS's airport shuttle transportation service.  ETS assigned jobs to Plaintiffs through ETS dispatchers based upon a queue system requiring drivers to wait on line. SOF ¶ 66-67.  Plaintiffs were required to abide by the terms of ETS's contract with the Port Authority. SOF ¶ 34, 50. Plaintiffs drove passengers based upon rates set by ETS, and could never negotiate their own rates because that would violate the PA Contract. SOF ¶ 51, 106, 108.  There is no issue of material fact that drivers worked in shifts based on fixed-schedules, and could not simply come and go when they pleased, as Plaintiffs were required to inform the dispatcher upon completion of their jobs for the day. SOF ¶ 36-37, 59-61, 65.  Further, the evidence shows that ETS would penalize drivers in the event that drivers refused to accept a job, or turned off their ETS-issued tablets. SOF ¶ 34, 86, 97-98, 97, 102, 104-105.  To comply with the PA Contract for security purposes, Plaintiffs also wore ETS uniforms and ETS identification badges, and had ETS logos painted on their vans. SOF ¶ 31, 41-43, 47, 54, 84, 109-110.

Clearly, the amount of control exercised by ETS over the conditions of Plaintiffs' work was substantial, as Plaintiffs worked on fixed schedules and could not simply work at their own convenience.  Under the NYLL test, focusing on the aspect of control, the determination that Plaintiffs are employees and not independent contractors is equally evident.

## II.   ETS FAILED TO PAY PLAINTIFFS MINIMUM WAGE UNDER THE FLSA AND NYLL

Under Section 206 of the FLSA and Section 652 of the NYLL, "[t]o establish liability on a claim for underpayment of wages, 'a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work.'" *Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 472 (S.D.N.Y. 2015) (quoting

*Kuebel v. Black & Decker*, 643 F.3d 352, 362 (2d Cir. 2011)).  "In particular, an employee must be paid at least minimum wage." *Id.* (citing 29 U.S.C. § 206(a); NYLL § 652(1)).  The minimum wage provisions apply only to workers who are "employees.". *Kavazanjian v. Naples*, 2006 WL 2795220, at *1 (E.D.N.Y. Sept. 26, 2006) (citing 29 U.S.C. § 206(a)); *Wang v. Hearst Corp.*, 2016 WL 4468250, at *4 (S.D.N.Y. Aug. 24, 2016) (both FLSA and NYLL minimum wage requirement "applies only to employees").

### A.      The Record is Clear that Plaintiffs Worked Uncompensated Hours

In a FLSA case, it is an employee's burden to prove that he performed work for which he was not properly compensated. *McGlone*, 49 F. Supp. 3d at 370 (citing *Jiao Shi Ya Chen*, 2007 WL 4944767, at *2 (S.D.N.Y. Mar. 30, 2007).  "However, under the statute it is the employer's responsibility to 'make, keep, and preserve' records of employee wages and conditions of employment." *Id.* (quoting 29 U.S.C. § 211(c); 29 C.F.R. § 516.2).[8]  "Where an employer fails to maintain adequate or accurate records of its employees' hours, the employee need only 'produce[] sufficient evidence to show the amount and extent of [the uncompensated] work as a matter of just and reasonable inference.'" *Id.* (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)); *Acosta v. Hall of Fame Music Stores, Inc.*, 2015 WL 1003550, at *4 (E.D.N.Y. Mar. 5, 2015).  Significantly, "the burden is not high." *Salinas*, 123 F. Supp. 3d at 472 (citing *Kuebel*, 643 F.3d at 361).  An employee need only provide "estimates on his own recollection" to satisfy his or her burden. *Id.* (citing *Kuebel*, 643 F.3d at 361).  "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* (citing *Anderson*, 328 U.S. at 687-88).  If the employer fails to do so,

---

[8] Similar record-keeping requirements exist under New York law. *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 142–2.6. *McGlone*, 49 F. Supp. 3d at 371 n.1.

"the court may then award damages to the employee, even though the result be only approximate." *Id.* (citing *Anderson*, 328 U.S. at 687); *Acosta*, 2015 WL 1003550, at *4.

"Thus, the first step is to determine whether defendants have failed to keep accurate records." *McGlone*, 49 F. Supp. 3d at 371 (citing *Bueno v. Mattner*, 633 F. Supp. 1446, 1452-53 (W.D. Mich. 1986), *aff'd* 829 F.2d 1380 (6th Cir. 1987)). "'In wages and hours cases in which payroll and time records are kept, the accuracy and adequacy of the records can be determined in a variety of ways' including documentary evidence and deposition testimony of witnesses." *Id.* (citing *Agudelo v. E & D LLC*, 2012 WL 6183677, at *2 n.1 (S.D.N.Y. Dec. 11, 2012)).

Here, ETS completely failed to keep records of Plaintiffs' hours for the duration of each Plaintiff's employment, instead only kept archived reservations and invoices that did not detail their hours worked per day or week. SOF ¶ 128, 142.  Thus, in the absence of these records, to meet their initial burden, Plaintiffs testified that they routinely worked six or seven days per week, for approximately ten to twelve hours per day, totaling approximately sixty to eighty-four hours per week. SOF ¶ 71-73, 75-77, 123-127.  Additionally, and critically for the purposes of this motion, *Plaintiffs* produced records that documented the dates they worked, complete with start times, end times, driving hours, truck number, and normal work reporting location on a document entitled "Driver's Time Record." SOF ¶ 77.  In response, Hoyte, as ETS's corporate witness, testified that ETS kept the drivers' hours in invoices. SOF ¶ 142.  But a plain look at the invoices exposes that testimony to be false, as the invoices are no different than the archived reservations, showing *only* the reservation times and not the hours that each Plaintiff worked. SOF ¶ 142.  More importantly, the sample invoices provided, showing a snapshot of Plaintiff Wilson's six-day workweek from January 2, 2013 through January 7, 2013, establishes that Wilson's pickup times support his testimony and the Driver's Time Record he produced with

respect to the hours he works. *Compare* SOF ¶ 142, Ex. 36 *with* SOF ¶ 143, Ex. 13.  Thus, ETS has not in discovery (despite voluminous requests and compel orders, *see* ECF Dkt. No. 48) and thus cannot now in opposition to Plaintiffs' motion produce any evidence to create a material dispute over the amount of hours that Plaintiffs' each claim to have worked per week.

### B.        The Record is Clear that ETS Paid Plaintiffs Below Minimum Wage

Under FLSA § 206(a), the applicable minimum wage rates relevant to this motion are as follows: $5.85 an hour, beginning on July 24, 2007; $6.55 an hour, beginning July 24, 2008; and $7.25 an hour, beginning July 23, 2009. 29 U.S.C.A § 206(a); *Armata v. Unique Cleaning Servs., LLC*, 2015 WL 12645527, at *5 n.5 (E.D.N.Y. Aug. 27, 2015).  Under the NYLL, for the time period relevant to this motion, the applicable minimum wage rates are: January 1, 2007: $7.15; July 24, 2009: $7.25; December 31, 2013: $8.00; and December 31, 2014: $8.75. *See History of the General Hourly Minimum Wage in New York State*, *available at* https://www.labor.ny.gov/stats/minimum_wage.shtm.  Importantly, "where the state minimum wage rate is higher than the federal rate, an employee is entitled to the state rate." 29 C.F.R. § 778.5; *Castellanos v. Deli Casagrande Corp.*, 2013 WL 1207058, at *4 (E.D.N.Y. Mar. 7, 2013).

Critically, for the purposes of this motion, "minimum wage must be paid free and clear of any deductions or kickbacks to the employer." *Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 299 (E.D.N.Y. 2013) (citation omitted); *Perez v. Westchester Foreign Autos, Inc.*, 2013 WL 749497, at *9 (S.D.N.Y. Feb. 28, 2013).  Under the FLSA:

> Whether in cash or in facilities, 'wages' cannot be considered to
> have been paid by the employer and received by the employee
> unless they are paid finally and unconditionally or 'free and clear.'

29 C.F.R. § 531.35; *see also Arriaga v. Florida Pac. Farms*, 305 F.3d 1228, 1236 (11th Cir. 2002) ("there is no legal difference between deducting a cost directly from the worker's wages and shifting a cost, which they could not deduct, for the employee to bear").  Indeed, "[s]ince the

purpose of the minimum wage laws is to provide workers with a minimum standard of living, employer-provided food and lodging may be deducted from wages, but items 'primarily for the benefit or convenience of the employer,' like tools of the trade, may not be deducted." *Morangelli*, 922 F. Supp. 2d at 299 (citing C.F.R. § 531.3(d)).[9]

In *Morangelli*, the defendants argued that the company need not reimburse the plaintiffs for all of their van-related expenses, but only those incurred on the employer's behalf. 922 F. Supp. 2d at 299. The defendants argued that expenses related to personal use, such as gas, tolls, depreciation, and maintenance should not be considered in determining the proper minimum wage payment. *Id*. The court rejected this argument for two reasons. First, the court noted that the "incidental personal uses . . . pale in comparison to the abundant evidence that suggests that [employees'] van-related costs were primarily for the benefit of [the employer]. *Id.* at 300 (citing *Lin v. Benihana Nat'l Corp.*, 755 F. Supp. 2d 504, 511 (S.D.N.Y. 2010)) ("[v]ehicles . . . are considered 'tools of the trade' if employees are required to possess and utilize them in the course of their employment."). Second, the court stated that "[m]ore importantly, the fact that the [employees] made incidental personal use of the vans does not imply that van-related expenses were not *primarily* for [employer's] benefit." *Id.* (citing *Marshall v. Sam Deli's Dodge Corp.*, 451 F. Supp. 294, 304 (N.D.N.Y. 1978)) (emphasis in original).

In the instant matter, with respect to the amount of wages paid, there is no dispute that ETS used a "book out" process to pay or reimburse drivers once a week. SOF ¶ 129-130. The "book out" process was as follows: (1) the weekly cash from passengers kept by the drivers was added to the weekly charges obtained by ETS; (2) from that total, ETS either multiplied by 35%

---

[9] "Similarly, New York regulations provide that the minimum wage shall not be reduced by expenses incurred by an employee in carrying out duties assigned by his employer." *He v. Home on 8th Corp.*, 2014 WL 3974670, at *9 (S.D.N.Y. Aug. 13, 2014); *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 40 n.8 (E.D.N.Y. 2015) (citing NYLL 198-b; NYLL 198-d).

for drivers that leased vehicles, or 75% for drivers that owned their own vehicles; and (3) the parties then satisfied this determined percentage by either the drivers giving ETS cash, or ETS writing checks to the drivers. SOF ¶ 131-133. As an example, in the "book out" dated May 10, 2015, Plaintiff Wilson received $550.00 in cash, and $772.00 in credit card charges, resulting in a total of $1,322.00. SOF ¶ 144. From this amount, ETS paid Plaintiff 35% of this total, plus $90.00 in tolls, which resulted in a total of $552.70. SOF ¶ 145. ETS further deducted $232.00 in expenses, leaving Plaintiff with a total of $320.70. SOF ¶ 146. Based on Wilson's recollection, and his Driver's Time Record corresponding to that same week of Sunday May 3, 2015, through May 9, 2015, it is undisputed in the record that he worked at least seventy hours that week. SOF ¶ 147. Accordingly, Plaintiff Wilson's hourly rate for this week was $4.58 per hour, well below the federal minimum wage of $7.25 per hour and state minimum wage of $8.75 per hour.

Additionally, and making Plaintiffs' argument even stronger, Plaintiffs also testified and provided sworn statements that their percentage received from ETS never included gas, as ETS did not reimburse drivers for gas expenses. SOF ¶ 148-149. Plaintiffs paid approximately $40.00 per day, or $280.00 per week, in gas expenses. SOF ¶ 149.[10] Moreover, any expenses that Plaintiffs incurred on their vans were primarily for ETS's benefit, and therefore it must be considered a tool of the trade. The Plaintiffs used the vans for the overwhelmingly primary purpose of driving ETS passengers in shared-service shuttle trips, and any personal use was incidental. This incidental personal usage, like the plaintiffs in *Morganelli*, paled in comparison to the usage of the vans that was primarily for the benefit of ETS. Therefore, the deductions for

---

[10] When Plaintiffs drove their own vehicles, they were responsible for tolls, the base fee, the weekly Port Authority fee, and maintenance fees. SOF ¶ 134. Plaintiffs were also required to purchase a minimum $5,000,000 insurance policy according to Port Authority guidelines. SOF ¶ 135.

gas, tools, fees, insurance, and maintenance of the vans must be considered when calculating the wage paged in determining whether the rate complied with the minimum wage.

It is irrefutable that the amount ETS paid to the Plaintiffs, after deducting Plaintiffs' gas expenses alone, was well-below minimum wage.  The following table illustrates this:[11]

| Plaintiff | Book Out Date | Total Cash Plus Charges | Amount Paid to Driver | Gas Expenses | Days Worked | Hours Worked | Hourly Wage |
|-----------|---------------|-------------------------|------------------------|--------------|-------------|--------------|-------------|
| Feabon Thomas | 1/18/2015 | $1,529.00 | $831.75 | $280.00 | 7 | 84 | $6.56 |
| Denis Wilson | 3/1/2015 | $1,708.00 | $687.80 | $240.00 | 6 | 72 | $6.22 |
| Christopher Ricketts | 4/26/2015 | $1,051.00 | $457.85 | $240.00 | 6 | 72 | $3.03 |
| Germaine Allen | N/A | $2,000.00[12] | $700.00 | $240.00 | 6 | 70 | $6.57 |
| Michael Cooke | N/A | $2,500.00[13] | $900.00 | $280.00 | 7 | 84[14] | $6.19 |
| Cashmere Mudayh | N/A | $1,800.00[15] | $600.00 | $240.00 | 7 | 77[16] | $4.68 |

Therefore, if the Court finds that an employment relationship exists, then the Court should likewise find that ETS failed to pay Plaintiffs at least the minimum wage per hour worked

---

[11] Defendants produced Book Outs **only** for 2015 because they were not in possession of any other records, despite their record-keeping requirements. 29 U.S.C. § 211(c); 29 C.F.R. § 516.2; N.Y. Comp. Codes R. & Regs. tit. 12, § 142–2.6.  Consequently, Defendants failed to produce book outs for Plaintiffs Allen, Cooke, and Mudayh.

[12] Plaintiff Allen worked six days per week, working a minimum of ten hours per day, and sometimes thirteen hours per day, routinely working between sixty and seventy hours per week.  Allen made $2,000.00 per week. SOF ¶ 126.

[13] Plaintiff Cooke made approximately $2,500.00 in total cash and charges, and received approximately $900.00 from that amount each week, which did not include gas expenses. SOF ¶ 151.

[14] Plaintiff cooked worked approximately fourteen hours a day, seven days per week. SOF ¶ 127.

[15] Defendant Hoyte paid Plaintiff Mudayh.  Mudayh received approximately $1,800.00 in total cash and credit charges each week, and ETS paid Mudayh approximately $600.00 per week from ETS, which did not include gas expenses. SOF ¶ 83.

[16] Plaintiff Mudayh worked seven days per week, approximately eleven hours per day. SOF ¶ 127.

under the FLSA and NYLL, and grant Plaintiffs' partial motion for summary judgment on liability on this claim, saving the issue of damages for trial.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Partial Summary Judgment on the employee-employer relationship, and for minimum wage liability under the FLSA and NYLL against Defendant ETS.

Dated: New York, New York
   March 10, 2017

         Respectfully submitted,

         Jeffrey R. Maguire (JM4821)
         Alexander T. Coleman (AC8151)
         Michael J. Borrelli (MB8533)

26